CITY OF MERIDIAN *v.* RHODA POOLE.

[40 South. Rep., 548.]

1. MUNICIPALITIES. *Streets. Dedication. Land outside of limits.*

Land outside of but adjoining the limits of a municipality may be dedicated to it for street purposes.

2. SAME. *Postponing opening, etc.*

A municipality accepting a dedication of land for a street may postpone its actual use until advancing population and private improvements make the same necessary.

3. SAME.

Dedication of land to a municipality for a street and its acceptance as such is not negatived by the fact that the municipal authorities did not presently open the street. .

FROM the chancery court of Lauderdale county.

HON. JAMES L. McCASKILL, Chancellor.

Mrs. Poole, the appellee, was complainant in the court below; the city of Meridian, the appellant, was defendant there. From a decree in complainant's favor the defendant appealed to the supreme court. The facts are fully stated in the opinion of the court.

The street in question is known as Pacific street, and extends along the most southern boundary of the triangle of land designated on the plat, page 109, as "A, B, C."

*Miller & Baskin,* for appellant.

The case of *Briel* v. *Natchez,* 48 Miss., 435, lays down the rule so clearly that this court will have no trouble in applying the law there declared to be the facts in this case and reaching the conclusion that the learned chancellor erred in rendering his decree in this cause. It is declared in that case that if at the time the town or city had no corporate existence, right to use the

streets and control over them will vest in the corporation so soon as created. Under the facts in this case surely the testimony, both record and oral, conclusively shows that there was a passageway or roadway, whether it was worked or not, between the

letters "A" and "C;" that it had been dedicated to the public use, and that this roadway or traveled way or street was a forty-foot strip; and after such dedications are made they cannot be revoked, as the court says it would violate good faith to the

public as well as those who have acquired rights with a view to the enjoyment of the easements. The dedication of private property to the public enjoyment must always be considered with reference to the use to which the thing is to be appropriated —whether the easement is of a highway, a street, a common, or a park; all rest upon the same general doctrine. Nor is it necessary that there should be a user following closely upon the dedication, as where streets are extended over suburban property. It may be years before the convenience of the public or of those who live upon adjacent lots, on account of the paucity of population, requires that they should be formally taken in charge by the municipal authorities. Such dedication of streets in a growing town must have such an interpretation as will comport with the common understanding.

The doctrine announced in *Briel* v. *Natchez* is also reaffirmed by this court in the case of *Indianola* v. *Montgomery,* 85 Miss., 312 (s.c., 37 South. Rep., 598).

*Amis & Dunn,* for appellee.

None of the lots conveyed by Mrs. Poole abut on the alleged street. They are all located on other streets wholly disconnected from it. If one makes a map and conveys with reference thereto, he is bound by all the map contains, because of his knowledge of the same. But in this case Mrs. Poole did not make a map. She did not convey with reference to a map she had made. She did not convey with reference to a map of which she had knowledge; and according to the map itself, she did not convey with reference to a known and designated street thereon which dedicated any part of her land to the public as a street, known as Pacific street. She merely conveyed with reference to a map made by Chalk, which, without her authority, included her lands; and it would be a perversion of the rule of equitable estoppel to hold under the facts shown

by this record that she is now estopped to deny the dedication of her land in Pacific street.

The contention made by the appellant, that if Chalk's addition map is not binding upon the appellee then there would be no way for a person living west of the land of the appellee to get into the city of Meridian, furnishes no reason in law or good conscience for the summary taking of the lands of the appellee for public use without compensation; but the truth is, that a simple glance at the map showing the several streets and avenues in the city in that section will abundantly demonstrate the fact that the strip of land in controversy is not even necessary for the public use.

The testimony of Dillehay and John T. Chalk, to the effect that C. C. Chalk in his life time had expressed an intention to dedicate this property to the public use, will not suffice to show actual dedication by him. The mere expression of an intention to dedicate, even if it were sufficient in any cause, is wholly refuted in the instant case by the fact that just before his death C. C. Chalk conveyed the entire tract of land to his wife, the appellee here, by a deed, describing the lands by metes and bounds, which makes no reference whatever to a dedication of any part of the lands by himself heretofore made. If C. C. Chalk were alive, he would be estopped by his deed to say that he had made a dedication of any part of the lands contained or described in his deed. And, certainly, if he would be estopped to testify to such facts, third persons ought not to be permitted to testify to his declarations to that effect.

WHITFIELD, C. J., delivered the opinion of the court.

The bill in this case was filed by Mrs. Rhoda Poole to enjoin the city of Meridian from entering upon and attempting to use as a street a certain piece of land claimed by Mrs. Poole to be her property. She deraigned her title from a deed made by J. W. Harvey and wife to C. C. Chalk, who was then the

husband of Mrs. Poole, she having afterwards intermarried with Mr. R. P. Poole. The deed from Harvey and wife was executed March 3, 1886. The amended answer denies the allegations of the bill and asserts that the property in dispute had been dedicated as a street of the city of Meridian, first in the year 1886 and afterwards in the year 1893; that said dedication had been recognized by Mrs. Poole, in that she had made certain conveyances with reference to a map of said property, designated as "Albert Chalk's Survey." The answer was made a cross-bill, praying that Mrs. Poole be required to remove the house that had been erected in said street. The house was erected in said street in 1900 by the husband of Mrs. Poole, R. P. Poole. The appellee also claims under a deed made July 11, 1892, by C. C. Chalk to his then wife, Rhoda Chalk, now Rhoda Poole. The deed from Harvey and wife, made March 3, 1886, describes the property "as shown on the attached plat by the letters A, B, C," and also refers to Rosenbaum's survey in section 13, etc. The plat first referred to as "Exhibit 3" will be set out by the reporter in full. That plat indicates that the south boundary of the triangular piece of property in dispute had 20 feet taken from it, and that the north boundary of the property just south, owned by J. W. Harvey, had 20 feet taken from it; the total 40 feet being indicated as the width of the alleged street, called "Pacific street," running from point A to point C on said plat. This plat is made part of the deed from Harvey and wife to C. C. Chalk, and was recorded at the same time with said deed and as a part of it. It was made by J. M. T. Hamilton, civil engineer, and at that time, March 3, 1886, the city engineer of Meridian. The parol proof in the case shows that this space was intended to be a street of the width of 40 feet, 20 feet to come off the south side of the triangular piece of property, and 20 feet off of Harvey's property south of it. Hamilton testified that at the time the map was made he made it at the instance of Chalk, the then

husband of complainant, and that he heard a conversation between J. W. Harvey and C. C. Chalk, to whom Harvey sold it, in which Harvey expressly refused to execute the deed to Chalk unless Chalk would give 20 feet as indicated off of the southern boundary of the triangular piece of land included within the letters A, B, C, to be used as a street when added to the 20 feet to be given by J. W. Harvey. This was definitely agreed to, as testified by Hamilton, and the deed made in pursuance of such agreement. This same triangle was afterwards mapped and platted by John T. Chalk, the brother of C. C. Chalk, and this map shows this same street substantially. In the deed from C. C. Chalk to Rhoda Chalk this John T. Chalk's survey is referred to, as well as C. C. Chalk's survey, and Rosenbaum's survey. In addition to this, it is shown that the complainant made several deeds, every one of which was made in reference to and in accordance with the Albert Chalk survey. The property south of the letters A, C, on this Exhibit 3, which the reporter has been directed to set out, is shown to be owned by J. W. Harvey and mapped and platted into lots. The Albert Chalk map, in accordance with which the complainant made the deeds referred to, was made in December, 1893, and was duly recorded. These deeds were executed, one on June 26, 1893, one on May 23, 1895, and one on the 4th of March, 1898, and in all these deeds the property was conveyed in accordance with the Albert Chalk survey. All maps sent out with the record and disclosed by the record show the line from A to C to be open, except for the obstruction made by this house erected by Poole in 1900. There does not seem ever to have been any attempt to appropriate this alleged street by any individual until the erection of this house in 1900.

Dillehay bought the property owned by Harvey south of the line A, C. He testified that this street was open, and that the space between Forty-Fifth and Forty-Sixth avenues was planked and used as a public sidewalk, and that it was a regu-

larly traveled street.  He further testified that at the time he bought the property from C. C. Chalk, as the agent of Mr. Harvey, he intended to plat the property into lots and blocks on Pacific street, to be sold, and that all of them, except one, would face that street; and, further, when asked what Mr. Chalk said to him about there being a street at the time he was wanting to sell the property to him, he expressly stated that the purchase was based upon that space being a street, and that Mr. Chalk, in making that sale to him, was the agent of Mr. Harvey; further, he stated that Mr. Chalk well knew his purpose in buying the property, and actually superintended the mapping and platting of it as his (Dillehay's) agent, and that nine lots and two blocks were abutting on this Pacific street. He further testified that certain houses, the Phillips residence and the Maas residence or store, fronted Pacific street on the south side.  John T. Chalk, in testifying about the deal between Mr. Harvey and C. C. Chalk, said: "My brother told Mr. Hamilton to run the line as Mr. Harvey wanted it.  I heard that.  He told him to go ahead and make the survey as Mr. Harvey wanted it, and Mr. Harvey stated: 'I will give 20 feet, and you must give 20 feet, for a street or roadway.' " Mr. Chalk further testified that his brother, C. C. Chalk, expressly agreed to give this 20 feet, and that this Pacific street had been used as an old road, or part of the way at least, for 40 years or longer, and that this Pacific street had been opened as a street since the map was made in 1886, and had been used as a street by foot passengers.  Chalk, Dillehay, and Williams all testified that the street had been worked to some extent at least by the city, and that there was a path or footway along said street traveled by pedestrians.  Mr. Chalk says that the city kept a footbridge across the ditch for years and years, and that the bridge was used by citizens of the town and county; that one time the city worked Pacific street from A down to Forty-Sixth avenue for Mr. Daman, a citizen who lived out

there; that he was there when they worked it and saw it when it was worked. Dillehay testified that there were telephone poles on Pacific street, and that there was a plank sidewalk except at one small point. He further testified that said Pacific street, between A and C, had been worked by the city to his knowledge; that Mr. Daman was a member of the board and of the city committee; that Mr. Busby was the city overseer, and that it was during his administration that this Pacific street was plowed; Mr. Daman stating at the time that they would not then put a bridge over the ditch, but would do it later.

Again, admitting that there were corn and cotton ridges in Pacific street, which had been an old field for a number of years, and that there might possibly be some there now, he nevertheless testified that the street had been worked at one time, or partly worked, by the city. J. H. Williams, who was a witness for the complainant, stated there was a footwalk along Pacific street, and that the city built a footbridge, and that there was a street west from the Cox building, and that there had never been any obstruction of the footway prior to the erection of this Cox house in 1900, and that there was a footway running from his store in a southwesterly direction, which was kept up by the city, and that the bridge, where the footway intersected Forty-Fifth avenue, was kept up by the city, and that the footway was for the benefit of school children and people traveling that way. No claim was ever made by C. C. Chalk during his life time against the dedication of Pacific street to the city. It is immaterial that Pacific street was outside the city limits at the time the Harvey deed was made. The principles of law applicable in this case are to be found in *Briel* v. *City of Natchez,* 48 Miss., 435, approved in the case of *Indianola Light, etc., Co.* v. *Montgomery,* 85 Miss., 312 (37 South. Rep., 958). We quote from the *Briel case,* and approve and reaffirm the following: "Nor is it necessary, in order to manifest a ratification or acceptance of the dedica-

tion, that the municipal authorities should presently open the streets. That may be postponed until the advancing population and private improvements make it necessary. It may be years before the convenience of the public, or of those who live upon adjacent lots, on account of the paucity of the population, requires that they should be formally taken in charge by the municipal authorities. Such dedication of streets in a growing town must have such an interpretation as will comport with the common understanding. The proprietor of the ground ought to be held as proclaiming and offering to the public to change his property from rural to urban and sell it in small parcels with reference to streets and squares. Because the neighborhood is not rapidly settled up, and years may elapse before the city undertakes to work and grade the streets, or before the necessity arises, the city should not, by such nonuser, be held to have relinquished the easement and abandoned its acceptance of the dedication."

The strongest proposition urged by counsel for appellee is that all this land was an old field, which had been planted in corn and cotton at the time of the deed from Harvey to Chalk in 1886, and that it was then outside the city limits, and that all in effect that the transaction amounted to was to create a private agreement between Harvey and Chalk, and not a dedication to the city of Meridian as a street; and it is said that the case of *Sanford* v. *Meridian,* 52 Miss., 383, is the authority which should control this case. But an examination of that case will show plainly that it is a wholly different case on its facts from the case at bar. There the testimony on all material points was in hopeless conflict, complainants and their witnesses claiming that the street was and ever had been 80 feet wide, and defendant's witnesses averring with equal positiveness that the street was and ever had been 60 feet wide. And it is a noteworthy fact that the witnesses were not cross-examined, but each party seemed content to let the other prove

whatever his witnesses could be brought to depose, without the solitary check of a cross-examination. The court, naturally, in such a case, was unable to say that the decree of the chancellor was manifestly wrong. The facts there were: Ragsdale had located an imaginary city, called the city of Ragsdale, at a point where he supposed the two approaching railroads would intersect each other. He laid off Mississippi street as 80 feet wide on a plat of this imaginary city. But the railroads actually intersected at a different point, now Meridian, and the testimony in the case did not show that it covered any part of the city of Ragsdale. But the testimony did show that Mississippi street in the city of Ragsdale was not embraced in the city of Meridian. Now, this mapping and platting of the city of Ragsdale took place in 1858. The great civil war intervened, and after the ruin it had wrought, in 1867, Ragsdale prepared a new survey, in which he made many changes from the old one, and that portion of his land where Mississippi street was designed to be was still an old field in 1867, wholly unoccupied except for a Baptist church. Ragsdale did not intend to make any change in this street; but, when it came to be run out at a width of 80 feet, it was found to infringe upon this Baptist church. The authorities of the church thereupon asked him to reduce the street to 60 feet, which was the width of the connecting streets in this city of Ragsdale. He had already sold three lots upon this street, and he said if the vendees of these lots would consent that he would alter the street. All of them consenting, the street was run out at 60 feet and so marked on the new map. The map of this last survey was presented by Ragsdale to the board of mayor and aldermen, and was accepted by them March 6, 1867. Said ordinance recited, however, that "Mississippi street shall be established as an 80-foot street." And it was this last proviso that was in contention in this case of *Sanford* v. *Meridian.* It was further shown in that case that Mississippi street was

on the outskirts of the town, and that the principal buildings on it were on the three lots whose owners had consented to the reduction of the street to a width of 60 feet, and the present holders of that property at the time the case was tried insisted naturally on this width being maintained. That case further shows that the map of the survey of the proposed city of Rags-- dale, known as "Vosburg Survey," covered different territory from the territory embraced in the city of Meridian, and that said map of said survey was never offered for acceptance to the authorities of the new town of Meridian, and that no lots were ever sold as bounded on Mississippi street as an 80-foot street, except the three which we have referred to, and the owners of those lots consented to the reduction to the width of 60 feet. It might well be held on the facts of that case that there never had been any dedication of Mississippi street as a street to the city of Meridian; but how widely different the facts of that case are from the facts of this case, on the proposition we have referred to, is manifest from the evidence which we have set out in this opinion. We think Pacific street was dedi- cated as a street of Meridian.

*It follows that the decree must be reversed, and the cause remanded for a decree granting the relief prayed for in accord- ance with the principles announced in this opinion.*